STATE OF NORTH CAROLINA v. JOHN T. CATES

No. 7414SC647

(Filed 4 December 1974)

**Criminal Law § 114; Kidnapping § 1— prejudicial jury instructions**

> In a prosecution for kidnapping where the evidence tended to show that defendant picked up a university student who was hitchhiking, the trial court's instruction which included the words, "the court instructs you *that the fact that . . .,*" was prejudicial to defendant, since the jury could have understood the judge to mean that the most crucial facts at issue were established.

APPEAL by defendant from *Brewer, Judge,* 4 February 1974 Session of Superior Court held in DURHAM County.

Defendant was originally arrested on a warrant issued 28 November 1973 on the alleged victim's complaint. The warrant charged defendant with assault on a female "by pulling her to him by the knees and shoulders putting her in fear of bodily harm."

Later an indictment was submitted to the grand jury charging defendant with kidnapping and the grand jury returned a true bill of indictment on 7 January 1974. Apparently defendant was never tried on the original charge contained in the warrant.

Evidence for the State tended to show the following. The victim of the alleged assault and kidnapping was a female student at Duke University. About 7:20 p.m. on 27 November 1973, she was attempting to hitchhike a ride from passing motorists. As defendant approached she solicited a ride by signaling with her thumb. Defendant stopped and the female student got in his car. For some time they rode along with nothing being said about their respective destinations. The pair talked generally about defendant's employment in the construction industry and

the student's field of study. On one occasion the car stalled at a stoplight and this prompted conversation about the general condition of the automobile. After they passed Chapel Drive on the university campus, the student told defendant that he could let her out at the corner. The student testified that after she told defendant he could let her out at the corner:

> "He said he'd let me out a little further up. Then when we passed the exit that goes to the new dorms, I said he could let me out there, and he said, 'Is this where you. are going'? And I said yes. He said, 'I'll let you out up there where it leads out to University Drive,' and I said, 'This is fine, this is where I am going.' Then he said he'd let me off a little further up. At this time we were near the stop sign.
>
> The stop sign is on the corner of Campus Drive Extension and University Drive, at Duke University. The Defendant didn't stop his car at the corner and turned right onto Duke University Drive. That is towards 751. I knew we were going away from the campus, and I asked him to please let me out, but he said that he would let me out further up. He asked me if I had a boyfriend, and I said yes and told him his name.
>
> At this point, I was sitting very near the door on the passenger side, and he put his hand on my knees and tried to pull me toward him, and I immediately pulled away. His other hand was on the steering column. I told him again [what] my boyfriend's name was . . . and that I was supposed to be meeting him that night. He took his hand away from my knees, took his eyes off the road and looked at me for a second. As we passed the road that goes toward the gymnasium, I said, 'Please let me out here, I am meeting [my boyfriend] and he is waiting for me.' There was no response from the Defendant, and as we passed that street, I said 'Please let me out,' and again no response from the Defendant.
>
> At that point he put one hand again on the steering wheel and put his arm around my shoulders and tried to pull me toward him again. When I pulled away this time, I didn't get as far to the door as I did the first time, and I asked him to please let me out. There was no response, and we were nearing the 751 junction.

University Drive deadends against 751. I realized the car would have to stop as we neared the intersection, so I opened the door ajar a little bit, so that when the car came to a stop, I got out immediately. I just stepped out in the intersection. There was a Volkswagen behind us at that time. I walked directly away from the car to my right to a grassy sort of a traffic intersection, and I walked towards that triangle. When I got out of the car, he pointed back of the car towards some woods and made a comment that the University was back towards the woods, but I didn't make any response. I stood on the grassy triangle for a few moments and then I recognized the car behind the Defendant's car as being one of the Duke University students. I walked towards the car, and recognized the two occupants as my friends at Duke, so I got into their car and asked them to take me back towards the University to West Campus so that I could call the police. I talked to Sergeant Davis of the Duke University police."

The student was then asked the approximate distance between where she first made her request to leave the car and where she got out at the intersection. She replied:

"I would say it was perhaps five or ten minutes of driving, and perhaps more than a mile. I got in the car at approximately 7:25 o'clock p.m. at East Campus and got out of the car at the corner of Duke University Road and 751 at approximately 7:35 or 7:40 o'clock, p.m."

Defendant testified that he was en route from Durham to his home in Orange County and that the quickest route was through Duke campus to Highway 751 and then to U.S. 70. His testimony continued:

"I saw [the student] at the bus stop hitch-hiking, so I stopped and she got in the car. I knew that she was hitch-hiking because she was standing on the curbing of the sidewalk with her thumb out like this. I stopped and gave her a ride, and she said hello when she got in the car. She did not say anything at that time about where she wanted to go. I then proceeded down the street which comes out at Duke Circle and leads to the West Campus.

As we proceeded towards the West Campus, we talked about school and about how long she had been a student there. I told her that I was not a student, but that I was

working at the construction site where they were constructing a bridge on the campus over one of the streets. We stopped at the stoplight beyond the Police Department on Duke Campus, and she still did not say anything to me about where she wanted to go. I proceeded on down towards the circle and passed the road that goes to Duke Chapel.

After we had passed the road leading to Duke Chapel, she said that she wanted to go to the Chapel. We were right there at a bench between the road that I went down and the road that leads to the tennis court, and I told her that I would let her out down at the stop sign at Campus Drive Extension and University Drive. When I told her this, she said okay. She never told me to let her out.

A. On the way down, I told her, I said 'It would be nearer for you to cut by the football field,' and I told her, I said, 'I will let you off on the football field,' and she said no, and I said that it would be closer.

Q. And what did she say?

A. She said okay. So I stopped at the stop sign.

We were then approaching the intersection of Campus Drive Extension and University Drive.

Q. What, if anything, did you do upon reaching that intersection? What, if anything, did you do?

A. I didn't do nothing.

Q. Well, did you stop the car or turn left or right?

A. I turned to the right there.

Q. University Drive?

A. Yes, sir.

Q. Does that proceed down to 751?

A. Yes, sir, right.

Well, after I had turned the corner and shifted the gears, I put my hand on her leg. I was just getting fresh with her. She told me not to do that, and when I tried to put my arm around her shoulders, she told me no again. I guess I was being persistent. After she told me no, I didn't touch her no more.

Then I told her that I would let her out at the stop sign that goes to Highway 70 from 751.

I intended to let her off where University Drive runs into 751.

A. Yes, sir. After I got fresh with her, I told her I would let her out at the stop sign.

I then proceeded to the stop sign, and she got out of the car, and I told her that the campus was back that way, but she didn't say anything. I did not try to go after her but proceeded on my way. Miss Withers had on a sweater and a skirt or it could have been a dress, I'm not sure. She is red headed and a very nice attractive girl."

The jury returned a verdict of guilty as charged and judgment imposing a prison sentence of not less than five nor more than ten years was entered.

*Attorney General James H. Carson, Jr., by Assistant Attorney General William Woodward Webb and Associate Attorney James Wallace, Jr., for the State.*

*David Q. LaBarre for defendant appellant.*

VAUGHN, Judge.

Defendant brings forward numerous assignments of error including several which are directed to the judge's charge. "No judge, in giving a charge to the petit jury in a criminal action, shall give an opinion whether a fact is fully or sufficiently proven. . . . " G.S. 1-180.

The court gave the following instructions as to the elements of the crime:

"I now instruct you, members of the Jury, for you to find the Defendant guilty of kidnapping, the State must prove three things beyond a reasonable doubt.

First, that the Defendant took [the student] and carried her from one place to another; and, second, that the taking and carrying away of [the student] was without lawful authority; and, third, that the taking and carrying away of [the student] was by force and against her will and against the will of [the student]. Actual physical force need not have been used. A threat of force would be sufficient.

The Court instructs you, members of the Jury, that this term of 'force' as set out in the elements of this crime, means any force that may have been exerted by the Defendant."

Immediately after the foregoing the court told the jury:

"(The Court instructs you *that the fact that* this was a moving automobile and was being driven on the road at a time that [the student] could not have gotten out of the automobile because it was a moving automobile, without subjecting herself to injury, at the time the automobile was first in the streets there, the University Road and the other streets, or after [the student] had requested that he let her out some, I believe, according to her testimony, some ten or twelve times, and that finally when the car stopped at a stop sign she jumped out of the car when it was not being operated.)" (Emphasis added.)

Nothing follows that part of the judge's charge enclosed in parenthesis which would shed light on its meaning. We cannot know whether the paragraph is unclear through oversight of the able trial judge or by error in transcription. In any event, we must take the record as we find it. *State v. Snead,* 228 N.C. 37, 44 S.E. 2d 359.

Most of the conflicts in the testimony involve the events which, in the last quoted paragraph, the judge is reported to have described as facts. An assumption by the court that any fact, contradicted by defendant's plea of not guilty, has been established is prejudicial error. *State v. Swaringen,* 249 N.C. 38, 105 S.E. 2d 99. It appears to us that the jury might well have understood the judge to mean that the most crucial facts at issue were established when, of course, there was merely evidence tending to show those facts and this evidence was contradicted by defendant.

We cannot say that the error was harmless. The jury had some difficulty in arriving at a verdict. On one occasion the jury returned to the courtroom and received permission to take the written instructions on the elements of the crime with them into the jury room. The case was a close one and the error may very well have tipped the scales against defendant.

Since there must be a new trial we will not discuss the other matters which defendant assigned or might have assigned as error.

New trial.

Judges CAMPBELL and BRITT concur.